**In the Matter Of:**

*DANITA HIGGS vs*

*GOLDEN TITLE LOANS*

*2:20-cv-02559 SHL/atc*

*DANITA HIGGS*

*March 04, 2021*



ALPHA REPORTING CORPORATION
1st in Reporting, 1st in Service, 1st in Technology
We Bridge the State and Cover the Nation!
www.alphareporting.com
800-556-8974



EXHIBIT Q

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION
   _____
 3
   DANITA HIGGS,                 )
 4                               )
        Plaintiff,                )
 5                               )
   VS.                           ) NO. 2:20-cv-02559 SHL/atc
 6                               )
                                 )
 7 GOLDEN TITLE LOANS, LLC,     )
   d/b/a 745 CASH,              )
 8                               )
        Defendant.                )
 9 _____
```

DEPOSITION

OF

DANITA HIGGS

ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, TN 38103
901-523-8974
www.alphareporting.com

Danita Higgs - March 04, 2021

2

1        The deposition of DANITA HIGGS is taken on
2   this, the 4th day of March 2021, on behalf of the
3   Defendant, pursuant to notice and consent of
4   counsel, beginning at approximately 1:00 p.m.
5   remotely via Zoom.
6        This deposition is taken pursuant to the
7   terms and provisions of the Federal Rules of Civil
8   Procedure.
9        All forms and formalities are waived.
10  Objections are reserved, except as to form of the
11  question, to be disposed of at or before the
12  hearing.
13       The signature of the witness is waived.
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:
                    MAX S. MORGAN, ESQ.
 4                  max.morgan@theweitzfirm.com
                    The Weitz Firm, LLC
 5                  1528 Walnut Street
                    4th Floor
 6                  Philadelphia, PA 19102
                    267-587-6240
 7

 8

 9   FOR THE DEFENDANT:
                    ADAM NAHMIAS, ESQ.
10                  adam@lnlawmemphis.com
                    Libby & Nahmias
11                  5384 Poplar
                    Suite 410
12                  Memphis, Tennessee 38117
                    901-343-0777
13

14

15

16

17   ALSO PRESENT:
                    DOUG GOLDEN, CORPORATE REP.
18

19

20

21   COURT REPORTING FIRM:
                    ALPHA REPORTING CORPORATION
22                  KORIAN NEAL, RPR, CCR, LCR #402
                    236 Adams Avenue
23                  Memphis, Tennessee 38103
                    901-523-8974
24                  www.alphareporting.com
```

Danita Higgs - March 04, 2021

```
                                                                      4
 1                        I N D E X

 2                     EXAMINATION INDEX

 3   DANITA HIGGS
          BY MR. NAHMIAS . . . . . . . . . . . . . . . .    5
 4

 5                      EXHIBIT INDEX

 6   EXHIBIT NUMBER     DESCRIPTION                        PAGE

 7   EXHIBIT NO. 1      Deferred Presentation               19
                       Services Agreement
 8
     EXHIBIT NO. 2      2015 File Update                    22
 9
     EXHIBIT NO. 3      Deferred Presentation               24
10                     Services Agreement

11   EXHIBIT NO. 4      2016 File Update                    27

12   EXHIBIT NO. 5      Complaint                           37

13   EXHIBIT NO. 6      Plaintiff's Objections              76
                       and Responses to Defendant
14                     Golden Title Loans LLC's First
                       Request for Production of
15                     Documents to Plaintiff

16   EXHIBIT NO. 7      Phone Calls Record                  77

17
     EXHIBIT NO. 8      Tennessee Title Pledge              87
18                     Agreement between Golden
                       Title Loans and
19                     Lashonda Robinson

20   EXHIBIT NO. 9      Plaintiff's Objections and          81
                       Responses to Defendant,
21                     Golden Title Loans LLC's
                       First Set of Interrogatories
22                     to Plaintiff


23

24   COURT REPORTER'S CERTIFICATE . . . . . . . . . . .103
```

Danita Higgs - March 04, 2021

5

```
 1              THE REPORTER:  Before we get started, I
 2   just need for counsel to stipulate that I am able to
 3   administer the oath to the witness via Zoom.
 4              MR. NAHMIAS:  Yes.
 5              MR. MORGAN:  Yes.  Korian, before we
 6   start, I see -- Adam, this wasn't noticed as a video
 7   dep.  Right?
 8              MR. NAHMIAS:  No.
 9              MR. MORGAN:  Okay.  I see recording.  Is
10   that just for the court reporter to make sure she
11   gets the record clear?
12              THE REPORTER:  Yes.
13              MR. MORGAN:  Yeah.  It's not going to be
14   distributed.  Correct?
15              THE REPORTER:  Right.  There is no video.
16              MR. NAHMIAS:  It's recording audio.
17              THE REPORTER:  Yes.  The office is doing
18   that.  Yes.
19                    DANITA HIGGS,
20   having been first duly sworn, was examined and
21   testified as follows:
22                     EXAMINATION
23   BY MR. NAHMIAS:
24        Q.   Good afternoon, Ms. Higgs.  My name is
25   Adam Nahmias.  I represent Golden Title Loans LLC.
```

```
 1  and uh-huh.  Okay?
 2       A.    Sure.
 3       Q.    State your name again for the record,
 4  please.
 5       A.    Danita Rochelle Higgs.
 6       Q.    What's your date of birth?
 7       A.    ▓▓▓▓ 1960.
 8       Q.    And this is a question that I have to ask
 9  everybody no matter what in depositions.  No
10  offense.  Are you under the influence of any
11  substances that would affect your ability to
12  remember or testify accurately today?
13       A.    No, I'm not.
14       Q.    Okay.  Have you ever been arrested?
15       A.    No, I haven't.
16       Q.    Okay.  Have you ever served in the
17  military?
18       A.    Yes, I have.
19       Q.    When?
20       A.    1988.
21       Q.    Just that one year?
22       A.    Yes.  Through '89.
23             THE REPORTER:  I'm sorry?
24             THE WITNESS:  Through -- from 1988 through
25  1989, for one year.
```

**Danita Higgs - March 04, 2021**

43

```
 1      Q.   Okay.
 2      A.   And the first -- yeah.  The other one was
 3  someone else.
 4      Q.   And you don't remember the manager's name?
 5      A.   No, I don't.
 6      Q.   What did the manager say when you spoke to
 7  him or her?
 8      A.   Her.  What did she say?
 9      Q.   Yeah.
10      A.   She just asked me when would I be able to
11  pay the loan.
12      Q.   Okay.  And in Paragraph 18, you say,
13  following these requests, you contacted 745 Cash and
14  attempted to repay the payday loan in full.  Did I
15  read that correctly?
16      A.   That's correct.
17      Q.   Okay.  And is that an accurate statement?
18      A.   It is.
19      Q.   Okay.  And it goes on to say that 745 Cash
20  notified Ms. Higgs that it had turned her account
21  over to a third party collection agency, Sullivan
22  and Associates, LLC, and could no longer accept
23  payment for the payday loan from Ms. Higgs.
24           Did I read that correctly?
25      A.   That's correct.
```

Danita Higgs - March 04, 2021

52

```
 1      Q.   What did you mean by even if she had?
 2      A.   Even if -- what I'm -- what my -- I guess
 3  the understanding for 23 and 24 is that even though
 4  I had given them consent to call me about the debt,
 5  my -- my statement to my attorney is even though I
 6  gave them consent to call me for the debt, I no
 7  longer owed the debt.  So the consent was null and
 8  void.
 9      Q.   Okay.  And that's the position you're
10  taking.  Correct?
11      A.   Yes.
12      Q.   Okay.  So when did you ask 745 Cash on
13  several occasions to stop calling or words to that
14  effect?
15      A.   I don't remember the exact date but
16  several times.  Several times, I did.  I called.
17  Which you -- I'm sure you have the evidence where I
18  called in and requested that I be taken off the call
19  because I no longer owed the debt.
20      Q.   And is it accurate, Ms. Higgs, to say that
21  would have taken place after 4/29/19?  Fair?
22      A.   Yes.
23      Q.   Okay.  Cool.  Okay.  Do you know who you
24  spoke to when you called and asked them to stop
25  calling you?
```

Alpha Reporting Corporation

Danita Higgs - March 04, 2021

58

```
 1      A.   I remember when I first talked to them
 2   about it, I told them that I had to make sure that I
 3   had clarity, which I did have, on me paying them
 4   because I don't agree with paying third party
 5   collection agencies.  And so I -- but I told her
 6   that I was instructed to pay her.
 7      Q.   But you knew when you paid off Sullivan
 8   that you were paying off a debt that was originally
 9   owed to 745 Cash.  Is there any question about that?
10      A.   No question.
11      Q.   In other words, you knew when you paid off
12   Sullivan, that, in effect, that was paying off a
13   debt from Golden Title Loans.  Correct?
14      A.   Yes.
15      Q.   And 27 mentions where you took the payoff
16   letter to the Getwell location.  Is that correct?
17      A.   That's correct.
18      Q.   Who did you give the payoff letter to?
19      A.   The manager that was there.
20      Q.   And who was that?
21      A.   Her name was Pamela.  I can't remember her
22   last name.
23      Q.   White?  Black?  Male?  Female?  Give me --
24      A.   Black -- black female.  She said she had
25   just started there.
```

Danita Higgs - March 04, 2021

59

```
 1      Q.   Do you know if that was Tammy Glasper, by
 2  any chance, Tammy?
 3      A.   I don't think it was Tammy.
 4      Q.   Okay.
 5      A.   It may have been Tammy, but I do -- I
 6  think her name was Pam.
 7      Q.   Okay.  That's fine.  I don't want you to
 8  guess.
 9           And you gave them the letter and you said
10  stop calling.  Correct?
11      A.   Correct.
12      Q.   Okay.  And it says that the representative
13  made a copy of the letter and stated it would be
14  placed in Ms. Higgs's file.  Is that correct?
15      A.   Correct.
16      Q.   Did you see her make a copy?
17      A.   I saw her walk over -- well, I saw her
18  walk back to her office.  I had no idea where she
19  was going.
20      Q.   Gotcha.  It says, "This same
21  representative also called the district manager and
22  informed the district manager of Ms. Higgs's demand
23  that all future calls cease."
24           Did I read that correctly?
25      A.   That's correct.
```

Alpha Reporting Corporation

Danita Higgs - March 04, 2021

60

```
 1      Q.    How do you know -- were you standing there
 2   while she called the district manager?
 3      A.    Standing right beside her.
 4      Q.    How do you know what the person on the
 5   other side -- how do you know who they were or what
 6   they said?
 7      A.    Because the manager at 745 Cash told me
 8   that she was calling her district manager in order
 9   to find out how to handle this.
10      Q.    I gotcha.  I gotcha.  So Paragraph 29 is
11   memorializing what the representative told you they
12   were going to do.  Fair?
13      A.    Fair.
14      Q.    Okay.  And it looks like in Paragraph 31,
15   "Subsequently, on two separate occasions, Ms. Higgs
16   contacted the 745 Cash corporate office directly to
17   demand that the calls stop."
18            Did I read that correctly?
19      A.    That's true.
20      Q.    Tell me, if you recall, or if you know,
21   what was the time frame between Paragraph 29, when
22   the representative was calling the manager, and then
23   you contacting the corporate office directly?  Do
24   you understand my question?
25            MR. MORGAN:  Object to the form.
```

61

1    A.   Yes.  I understand it.  But I don't know.
2  Because I was so upset and frustrated and irritated
3  by all of this, I don't remember the time.
4  BY MR. NAHMIAS:
5    Q.   I didn't catch that, Ms. Higgs.  I
6  apologize.  Say it one more time.
7    A.   I said that I was so frustrated at the
8  time just having to deal with all of this, I can't
9  remember what time.  I mean, a year could have
10 lapsed.  I don't know .
11   Q.   Well, I'm just trying to figure out.  You
12 say the 745 Cash corporate office directly.  Did I
13 read that correctly?
14   A.   That's correct.
15   Q.   So that's not the same thing as the
16 Getwell location.  Correct?
17   A.   No, it's not.
18   Q.   It's different.  Right?
19   A.   That's different.
20   Q.   All right.  So how did you contact the
21 corporate office?  Was it a phone call?
22   A.   A phone call.
23   Q.   Do you know who you spoke to?
24   A.   Don't remember her name.
25   Q.   Okay.  Was it a female?

```
 1  to store or produce telephone numbers to be called
 2  using a random or sequential phone number -- or
 3  number generator.  Excuse me.
 4          Did I read that correctly?
 5      A.  Yes, you did.
 6      Q.  How did you -- how do you know that?
 7          MR. MORGAN:  Object to the form.
 8      A.  My attorney knows that.
 9  BY MR. NAHMIAS:
10      Q.  So you don't know it, but your attorney
11  does?
12      A.  I know it because my attorney explained it
13  to me.
14          MR. MORGAN:  Adam, I'm going to object to,
15  you know, the line of questioning on, you know,
16  legal terminology and, you know, allegations made in
17  the complaint that are more on the law side of
18  things and not the factual side of things.
19  BY MR. NAHMIAS:
20      Q.  I just want to direct your attention to
21  Paragraph 46.  Do you see that?
22      A.  Yes, I do.
23      Q.  And you say that you suffered concrete
24  harm as a result of 745 Cash's telephone calls,
25  including, but not limited to, tying up her
```

```
 1  telephone line with unsolicited calls, completely
 2  filling her voice mail and rendering it unusable,
 3  lost time tending to the unwanted calls, responding
 4  to 745 Cash's unlawful conduct and the invasion of
 5  privacy by calling -- by calls continuing after she
 6  asked 745 Cash to stop calling and nuisance.
 7          Did I read that correctly?
 8      A.  Yes, you did.
 9      Q.  How often was your telephone line -- and
10  by the way, this is your cell phone.  Correct?
11      A.  Correct.
12      Q.  Not your business call -- business line,
13  is it?
14      A.  No.  Not my business.
15      Q.  You have a separate number for DH
16  Janitorial.  Right?
17      A.  Yes, I do.
18      Q.  Okay.  So your business line was not tied
19  up with these calls, was it?
20      A.  No, it wasn't.
21      Q.  And when you say tying up your telephone,
22  what does that mean?  That means --
23      A.  That --
24      Q.  Were you -- did you ever -- let ask it
25  this way.  I apologize.
```

```
 1            Did you ever not get a call?  Did you ever
 2   not receive a call because you were receiving
 3   unsolicited calls from 745 Cash?
 4            MR. MORGAN:  Object to the form.
 5       A.   Did I ever not get a call?
 6   BY MR. NAHMIAS:
 7       Q.   How about this:  Do you have call waiting
 8   on your phone?
 9       A.   Yes, I do.
10       Q.   So like if I call you and then Max calls
11   you, you can see that Max is calling and put me on
12   hold.  Correct?
13            MR. MORGAN:  Object to the form.
14       A.   Yes, I can unless you guys call at the
15   same time.  Then one call bumps the other and I
16   don't see it.
17   BY MR. NAHMIAS:
18       Q.   But how -- do you know how often your line
19   was tied up because of these calls that were made
20   that are the subject of your complaint?
21       A.   I don't have a number, but it was, I'm
22   sure, multiple times.
23       Q.   More than five?
24       A.   More than five.
25       Q.   More than ten?
```

Danita Higgs - March 04, 2021

72

1    A.    More than ten.
2    Q.    More than 20?
3    A.    More than 20.
4    Q.    So you're saying your phone was tied up
5  with these calls -- what does that mean, tied up,
6  tying up her telephone?  What do you mean by that?
7    A.    What I mean is the -- I had -- I had --
8  during the time, there was -- there would be -- I
9  had business calls to come through -- that comes to
10 me, other calls that comes to me.
11           So if I'm trying to handle something, then
12 745 Cash number constantly, constantly, constantly
13 dialing my line and interrupts -- their calls were
14 interrupting me.  I would have to put one call on
15 hold, answer that call to make sure.  Because I
16 didn't always look at my phone to see if it was the
17 745-22 number.
18           It was just tying up my phone.  I mean, it
19 was interrupting me.
20   Q.    Now, I was going to ask you, were all
21 the -- all the calls that are the subject of this
22 lawsuit were from this number there.  Right?
23   A.    Exactly.
24   Q.    So as you sit here, it's your testimony
25 that every time you saw that number pop on your cell

Danita Higgs - March 04, 2021

89

```
 1      A.   Did I tell them that I had a loan there?
 2      Q.   Did you ever tell any of these three
 3 ladies that you had procured loans or obtained loans
 4 from Golden Title Loans or 745 Cash?
 5      A.   Yes.  As far as me referring them to
 6 there, yes.
 7      Q.   That's what I was going to ask you.  In
 8 fact, you referred all three of these ladies to
 9 Golden Title, didn't you?
10      A.   Now, I don't remember Erica Whitfield.
11 Honestly, I don't remember if I ever told her.  But
12 I do know Lashonda and Denee, I did refer those two.
13      Q.   Okay.  And when you look at this pledge
14 agreement that's in Lashonda's name and purports to
15 be Lashonda's signature, you see that the home phone
16 and work phone, do you see that number?
17      A.   Yes.  Let me get my magnifying glass.
18      Q.   I'm sorry, ma'am.  Say that again.
19      A.   No.  I had to get my magnifying glass in
20 order to see it.  But yes, I see it.
21      Q.   Hang on.  Hang on.  I'm sitting here
22 looking -- I could have done this the whole time.
23 I'm an idiot.  Look at that.
24      A.   Oh, great.  Yeah.  I see it.
25      Q.   And that's your cell number, isn't it?
```

Alpha Reporting Corporation

Danita Higgs - March 04, 2021

90

```
 1      A.    Yeah, it is.
 2      Q.    Did you give her permission to use that
 3  number in this -- in connection with this document?
 4      A.    Oh, no, sir.
 5      Q.    Did you give her the authority to use it?
 6      A.    No, sir.
 7      Q.    But you would agree that it certainly
 8  appears that she's representing that 864-055 -- or
 9  864-5560 is her home number and work number.  Would
10  you agree with that, that that's what this document
11  says?
12            MR. MORGAN:  Object to the form.
13      A.    That's what the document says.
14  BY MR. NAHMIAS:
15      Q.    Okay.  Did you ever see her handwriting?
16      A.    No, I haven't.
17      Q.    Okay.  So you wouldn't know if that's her
18  signature or not, would you?
19      A.    No, sir, I wouldn't.
20      Q.    Now, I'll ask you the same thing.  On
21  these pages comprising Exhibit 9 -- or Exhibit 8.
22  Sorry.  There's signatures.  But you don't know if
23  that's her or not, do you?
24      A.    No, I don't.
25      Q.    Did she ever tell you she got a loan from
```

Danita Higgs - March 04, 2021

103

```
1                    C E R T I F I C A T E

2    STATE OF TENNESSEE     )
                            )
3    COUNTY OF SHELBY       )

4
             I, Korian Neal, LCR #402, RPR, CCR, Licensed
5    Court Reporter and Notary Public, in and for the
     State of Tennessee, do hereby certify that the above
6    1 was reported by me, and the transcript is a true
     and accurate record to the best of my knowledge,
7    skills, and ability.

8            I further certify that I am not related to
     nor an employee of counsel or any of the parties to
9    the action, nor am I in any way financially
     interested in the outcome of this case.
10
             I further certify that I am duly licensed by
11   the Tennessee Board of Court Reporting as a Licensed
     Court Reporter as evidenced by the LCR number and
12   expiration date following my name below.

13           I further certify that this transcript is
     the work product of this court reporting agency and
14   any unauthorized reproduction and/or transfer of it
     will be in violation of Tennessee Code Annotated
15   39-14-104, Theft of Services.

16           IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 22nd day of
17   March 2021.

18
                    [signature: Korian Neal]
19

20   _____
     Korian Neal, RPR, CCR, LCR #402
21   Expiration Date 06-30-2022
     Notary Public Commission Expires
22   04-30-2022

23

24

25
```