# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| DANITA HIGGS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GOLDEN TITLE LOANS, LLC d/b/a "745 ) <br> CASH," ) <br> ) <br> Defendant. ) | No. 2:20-cv-2559-SHL-atc |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

This case arises from a dispute involving a cell phone number ending in "5560," and raises questions of whether Defendant Title Golden Title Loans, LLC ("Golden Title") knowingly violated the Telephone Consumer Protection Act ("TCPA") by placing over three hundred calls to that phone number and leaving prerecorded messages, and, if so, whether those calls invaded Plaintiff Danita Higgs' privacy.

Before the Court are Golden Title's Motion for Summary Judgment, (ECF No. 31), Plaintiff's Response in Opposition to Golden Title's Motion, (ECF No. 33), and Golden Title's Reply to Plaintiff's Opposition. (ECF No. 36.) Also, before the Court are Plaintiff's Partial Motion for Summary Judgment, (ECF No. 32), Golden Title's Response in Opposition to Plaintiff's Partial Motion (ECF No. 38.), and Plaintiff's Reply to Golden Title's Opposition. (ECF No. 40.) For the following reasons, the Court concludes that the record contains no genuine disputes of material fact on the TCPA claim and finds that Higgs is entitled to judgment

as a matter of law on that claim.  As to the invasion of privacy claim, the Court concludes that there are genuine issues of material fact, which defeat summary judgment.  Thus, Golden Title's Motion for Summary Judgment is **DENIED**.  However, because Higgs is entitled to judgment as a matter of law on the TCPA claim and as to an award of treble damages for Defendant's violations, her Partial Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

I. **Lashonda Robinson's Debt**

The following facts are gathered from the Parties' statements of undisputed facts, depositions, and exhibits.  Disputed facts are noted as such.

On January 17, 2019, Lashonda Robinson used a kiosk machine to apply for and secure a loan from Golden Title at one of its store locations. (ECF No. 38-1 at PageID 634, ¶ 1.)  On the kiosk loan application ("Kiosk Application"), Robinson included several personal references and listed her cell phone number as ending in "8501."  (ECF No. 32-4.)  Robinson did not provide a home number on the application.  (ECF No. 38-1 at PageID 634; ECF No. 32-5 at PageID 232.)  She also noted that she worked for Danita Higgs' company, D.H. Janitorial, listed Higgs as her "floor supervisor," and the company and supervisor phone numbers as both ending in "5560" (the "Cell Number").  (ECF No. 32-4 at PageID 217.)  The Cell Number is Higgs's actual cell phone number.  (ECF No. 38-1 at PageID 635, ¶ 3.)

In response to Robinson's Kiosk Application, Golden Title's computer system automatically generated a "Tennessee Title Pledge Agreement" or "Title Agreement," (see ECF No. 32-27), which, distinct from the information Robinson manually included on the Kiosk Application, populated Higgs's Cell Number as both Robinson's "work" and "home" phone

numbers.[1]  (ECF No. 33 at PageID 402; see also ECF No. 33-2 at PageID 426 ¶ 16.)  Before Golden Title issued Robinson the title loan, it called what was listed as her work number and what is actually Higgs' cell phone to verify Robinson's employment.  (ECF No. 38-1 at PageID 635, ¶ 4.)

As of February 17, 2019, Robinson was in default on her title loan.  (ECF No. 38-1 at PageID 635, ¶ 4.)  Seeking repayment, Golden Title placed multiple calls to Robinson's cell phone number ending in "8501."  (ECF No. 38-1 at PageID 635-36, ¶ 5.)  When these attempts failed, Golden Title also called Robinson's references to locate her whereabouts.  (Id. at PageID 636, ¶ 6.)  Per Golden Title's policy of contacting the employers of defaulted customers, it called Higgs using the Cell Number on February 20 and 21, 2019, as well as on March 8 and 14, 2019, to again verify Robinson's employment.  (ECF No. 38-1 at PageID 636, ¶ 7; ECF No. 32-5 at PageID 235.)

At some point during this time, Robinson ended her employment with D.H. Janitorial, and Higgs notified Golden Title of Robinson's departure during the March 14, 2019 call.  (ECF No. 38-1 at PageID 636, ¶ 8.)  That same day, Golden Title made a note of this update on Robinson's account, stating that she was "no longer employed for the company."  (ECF No. 32-5 at PageID 236.)  On April 16, 2019, Golden Title noted in its system that Robinson sent them a text message stating "she has no job and not going to have one and nothing we can do."  (ECF

---

[1] Higgs asserts that Golden Title's computer system automatically generated the Title Agreement in response to Robinson's Kiosk Application and incorrectly included the Cell Number as Robinson's "home" and "cell" phone numbers.  Golden Title does not affirmatively dispute that its computer system automatically generated the Title Agreement and avoids the question of the agreement's accuracy given that Robinson did not manually complete it.  Instead, Golden Title maintains that Robinson "executed" the Title Agreement "in connection with a loan" and that it relied on the information in the Title Agreement to direct calls to Robinson.  (ECF No. 38-1 at PageID 634-35; 637.)  However, the questions surrounding the Title Agreement are not relevant, as explained infra at 10.

No. 38-1 at PageID 637, ¶ 10; ECF No. 32-6 at PageID 239.)  Golden Title admits that its policy is to <u>not</u> contact employers of defaulted customers if those customers were no longer employed by that person or entity.  (ECF No. 32-5 at PageID 237.)

On May 18, 2019, Higgs received the first automated, prerecorded call[2] from Golden Title, which, according to Golden Title's documents, was a call directed to Robinson's "work" phone number.  (ECF No. 38-1 at PageID 637, ¶11; 638, ¶ 14.)  Golden Title knew that it was directing this call to Robinson's "work" phone number.  (ECF No. 32-8 at PageID 255-56.)  The content of the prerecorded message stated that it was making a "special offer" to settle a past due debt but did not specify that the call and offer were intended for Robinson in connection with her outstanding balance.  (ECF No. 38-1 at PageID 637, ¶ 11.)  By July 2, 2019, Higgs had received 38 automated calls from Golden Title.  (ECF No. 38-1 at PageID 641, ¶ 28.)  According to Golden Title's own documents, it directed each of these automated calls, as well as those to follow, to Robinson's "work" phone number.  (ECF No. 32-11.)

On July 19 and 31, 2019, about one month after Golden Title started placing automated calls to Robinson's "work" phone number, Golden Title, yet again, manually called Higgs's cell phone to verify Robinson's employment.  (ECF No. 38-1 at PageID 638, ¶ 15.)  Higgs informed Golden Title of what it already noted in its system:  Robinson was no longer employed there.  (<u>Id.</u>)  Despite this information, Golden Title continued to direct its prerecorded messages to Robinson's "work" phone number and would do so until August 18, 2020.  Between May 18, 2019 and August 18, 2020, Golden Title's automated dialing system placed 385 calls to

---

[2] The prerecorded message read as follows: "This is 745 Cash calling with a special offer to settle your past due account.  Because of your past payment history, you have been selected to receive this special settlement offer.  Please press one to talk to a settlement specialist."

4

Robinson's "work" phone number, which was Higgs' Cell Number. (ECF No. 38-1 at PageID 637, ¶ 12.)

## II.     Plaintiff Danita Higgs' Past Debt

Years before this dispute, on August 16, 2016, Higgs applied for and received a loan from Golden Title. (Id. at PageID 639, ¶19.) At that time, Higgs included her home, work, and cell phone numbers on the loan application. (Id. at PageID 640, ¶ 20.) The Parties agree that the Cell Number was also listed as Higgs's cell phone number on past loan applications, and that Golden Title was aware of this fact. (Id. at ¶ 21.) On June 3, 2017, Higgs defaulted on her personal loan and did not pay her outstanding balance to Golden Title's debt collector, Sullivan & Associates, LLC until April 29, 2019. (Id. at ¶¶ 24-25.) Sullivan & Associates, LLC issued Higgs a payoff letter as evidence of repayment on that date. (Id. at ¶ 225.)

When Golden Title began placing the prerecorded messages to the Cell Number on May 18, 2019, Higgs assumed the messages were related to the debt she had recently repaid because they did not identify the intended indebted party. (Id. at PageID 641.) Golden Title states that it did not inform Higgs that the calls were intended for Robinson because, at that time, its computer system was not yet programmed to do so. (Id. at PageID 643, ¶ 41.) Higgs made repeated requests for Golden Title to stop calling her cell phone, but the calls continued even after Higgs notified Golden Title that she had repaid her loan and that Robinson was no longer employed there. She also and stated that the calls were "irritating" and that she felt harassed. (ECF No. 38-1 at PageID 643.)

On August 18, 2020, one day after Golden Title was served with the Higgs' Complaint in this action, the calls stopped. (ECF No. 38-1 at PageID 646, ¶ 51.)

## **STANDARD OF REVIEW**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense," and a "dispute over material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bruederle v. Louisville Metro Government, 687 F.3d 771, 776 (6th Cir. 2012). A court must view the facts in the record and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once a properly supported motion for summary judgment has been made, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record or must argue that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). The opposing party "cannot rest solely on the allegations made in [the] pleadings." Everson v. Leis, 556 F. 3d 484, 496 (6th Cir. 2009). Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## **ANALYSIS**

The Parties agree that Golden Title placed all 385 calls to the Cell Number labeled as Robinson's "work" phone number, and that Higgs received each of these calls although they were intended for Robinson. (ECF No. 38-1 at PageID 637.) The question here is whether

6

Golden Title violated the TCPA by placing these calls without the proper consent, and, if so, whether it acted knowingly, thus warranting treble statutory damages. Also at issue is whether these calls invaded Higgs' privacy by intruding upon her seclusion in a highly offensive way.

For the reasons stated below, the Court finds that, based on the undisputed material facts, Golden Title knowingly violated the TCPA by directing calls to Robinson's "work" phone number despite the lack of consent to call Robinson at work at the time the calls at issue were placed. As it concerns Higgs' invasion of privacy claim, the Court finds that the question of whether Golden Title acted in highly offensive way is a fact-specific inquiry that cannot be determined at this stage in litigation.

**I.      TCPA Claim**

The TCPA governs "automatic telephone dialing systems" used to contact consumers. 47 U.S.C. § 227(b)(1)(A)(iii). To prevail on a TCPA claim, a plaintiff must show that the defendant: (1) placed a call to the plaintiff's cellular telephone, (2) without the prior express consent, (3) using an automatic telephone dialing system or an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A).

It is undisputed that Golden Title used an automatic telephone dialing system to place 385 calls to Higgs's cell phone. (ECF No. 38-1 at PageID 637-38; 640.) Thus, the only element at issue is whether Golden Title had prior express consent to place these calls, or, more specifically, whether the prior consent had been revoked. Consumers may provide "prior express consent" by knowingly releasing their phone numbers to callers or providing it as part of a commercial transaction. Baisden v. Credit Adjustments, Inc., 813 F.3d 338, 342 (6th Cir. 2016). Similarly, debtors provide express consent to be contacted by their creditors about "an existing debt" when they give their phone numbers "in connection with" that debt. Hill v.

Homeward Residential, Inc., 799 F.3d 544, 551 (6th Cir. 2015).  For instance, when a debtor "give[s] his cellphone number as part of a credit application at the beginning of the debtor-creditor relations," he also provides his prior express consent to be contacted at the number about that debt.  Baisden, 813 F.3d at 344.

Once consent has been given, however, it may be revoked through any reasonable means, and a caller or creditor may not stipulate as to how revocation occurs.  Baisden, 813 F.3d at 348.  Although the Sixth Circuit has yet to weigh in on the issue of revocation of consent, according to the FCC and some other Circuits, "any silence in the [TCPA] as to the right of revocation should be construed in favor of consumers."  (Rodriguez v. Premier Bankcard, LLC., No. 3:16-cv-2541, 2018 WL 4184742 *1, *10 (N.D. Ohio August 31, 2018) (quoting Gager v. Dell Financial Services, LLC, 727 F.3d 265, 270 (3rd Cir. 2013)

Golden Title argues that, as the creditor, it had prior express consent to call both Higgs and Robinson on the Cell Number in connection with their debts because both, at some point in time, listed the Cell Number on their respective loan applications.  (ECF No. 31-2 at PageID 176.)  Specifically, Golden Title points to the Title Agreement, which lists the Cell Number as Robinson's "home" and "work" phone numbers, as the source of its consent to contact Robinson, asserts that it relied on this information when directing the calls, and argues that Robinson never revoked this consent.  (ECF No. 31-2 at PageID 178.)  On the other hand, Higgs argues, among other things, that there was no consent for Golden Title to place the 385 calls to the Cell Number between May 18, 2019 and August 18, 2020 because (1) she repaid her debt in April 2019, thus revoking her consent to call related to her own repaid debt, and (2) she informed Golden Title that Robinson no longer worked for D.H. Janitorial as early as March 2019, thus revoking consent to call Robinson's "work" phone number.  The Court agrees with Higgs.

8

As an initial matter, the Court briefly addresses the consent arising from Higgs' past loan. It is undisputed that Higgs provided the Cell Number in connection with a payday loan she received from Golden Title on August 16, 2016. (ECF No. 32-1 at PageID 190; ECF No. 31-1 at PageID 97.) By listing the Cell Number on Golden Title's loan application, Higgs provided "prior express consent" to be contacted by Golden Title about <u>her</u> debt. Higgs repaid her loan to Golden Title's third-party debt collector on April 29, 2019, thus her consent for this debt extinguished on that date.

Next, the Court turns to the consent arising from Robinson's loan. Like Higgs, Robinson consented to be contacted by Golden Title about her existing debt when she applied for her loan. As mentioned above, the Robinson's Kiosk Application includes her cell phone number ending in "8501" as well as her work phone number (the Cell Number), while the Title Agreement lists Robinson's "home" and "work" phone numbers as the Cell Number. Higgs challenges the legitimacy of the Title Agreement by arguing that Golden Title's computer system "automatically generated" this document in response to Robinson's completion of the Kiosk Application and "incorrectly" included the Cell Number as Robinson's home number. (ECF No. at 33 at PageID 402.) Ultimately, this factual dispute is immaterial because even if the Title Agreement did properly convey Robinson's consent to call the Cell Number as Robinson's home number (Defendant's contention), the evidence in the record shows that Golden Title called that number as her work number, and consent to call Robinson's work number had been properly revoked.

Importantly, there is no dispute that Golden Title's automated dialing system directed all 385 calls to Robinson's "work" number, which was the Cell Number. (ECF No. 32-11 at PageID 274; ECF No. 33-10 at PageID 492.) However, at the time of these calls, Golden Title

9

was aware that Robinson was no longer employed. According to Higgs, Golden Title's knowledge of Robinson's unemployment effectively terminated consent to call her work number. (ECF No. 33 at PageID 411.) The Court agrees.

As early as March 14, 2019—approximately two months before Golden Title placed the first automated, prerecord call to the Cell Number—Higgs notified Golden Title that Robinson no longer worked for D.H. Janitorial. (ECF No. 38-1 at PageID 636, ¶ 8.) Golden Title manually called Higgs to verify Robinson's unemployment several times thereafter. (ECF No. 38-1 at PageID 638.) On April 16, 2019, Golden Title noted in its system that Robinson herself informed it that she was unemployed. (ECF No. No. 33 at PageID 411.) Despite these multiple notices from both Higgs and Robinson, Golden Title continued to use the Cell Number listed as Robinson's "work" phone number when placing the prerecorded calls. Golden Title even admits that it would have no reason to call the employer of an indebted customer once it learned the indebted customer was unemployed. (ECF No. 32-11 at PageID 274; ECF No. 32-5 at PageID 237.) Despite that admission, they continually called Higgs, Robinson's previous employer.

The Court concludes that repeated notification of Robinson's unemployment is a reasonable way to revoke consent to contact Robinson at her "work" phone number. So even if the computer-generated Title Agreement legally conveyed Robinson's consent to call her "home" number, that fact is irrelevant here because the record shows that Golden Title never used Robinson's "home" phone number, but rather continually directed calls to her "work" number.

Because the prior express consent from both Robinson and Higgs for Golden Title to place the 385 automated, prerecorded calls to the Cell Number had been revoked, and Higgs was the actual recipient of these calls, Golden Title violated the TCPA. Thus, Higgs' Partial Motion

is **GRANTED** and Golden Title's Motion for Summary Judgment on the TCPA claim is **DENIED**.

## II.     Treble Damages

Higgs also seeks summary judgment on her treble damages claim under the TCPA. (ECF No. 32-1 at PageID 195.) A person who has received more than one telephone call within any 12-month period in violation of the TCPA may recover "actual monetary loss from such violation, or. . . receive up to $500 in damages for each violation, whichever is greater, or both such actions." 47 U.S.C. 47 U.S.C. § 227(b)(5). If a court finds a willful or knowing violation of the TCPA, the court may, in its discretion, treble the statutory damages so that the plaintiff may recover $1500 for each violation. Id. Malicious or wanton conduct is not required. Harris v. World Fin. Network Nat'l Bank, 867 F. Supp. 2d 888, 895 (E.D. Mich. Apr. 3, 2012) (quoting Alea London Ltd. v. American Home Services, Inc., 638 F.3d 768, 776 (11th Cir. 2011).

Here, Golden Title, seeking to circumvent the knowledge requirement of the TCPA's treble damages provision, argues that Higgs' statutory damages should not be tripled because it placed the 385 calls to the Cell Number in "good faith." (ECF No. 38 at PageID 630.) Specifically, Golden Title argues that each call was placed in reliance on a number Robinson included on the Title Agreement, and that it had neither the duty nor the technology to cross-reference its system to determine whether its customer accounts shared the same phone numbers. Golden Title cites Michel v. Credit Prot. Ass'n L.P., No. 14-cv-8452, 2017 WL 3620809, at *6 (N.D. Ill. Aug. 23, 2017), a non-binding authority, to support its "good faith" argument.

The issue before the Michel court was whether defendant debt collector was liable under the TCPA for placing calls to plaintiff's cell phone to seek repayment of two separate debts from different creditor accounts if plaintiff told defendant to stop calling him for one account, but not

11

the other. Id. at *1. The court ruled in favor of defendant, finding that consent and revocation are creditor-specific, reasoning that because the debt collector took the place of plaintiff's two creditors, it obtained consent from two independent sources for unrelated purposes. Id. at *5. Thus, plaintiff's revocation of one could not anticipatorily extend to the other or any future debts. Id.

Here, Golden Title argues that, like the Michel plaintiff, Higgs was contacted on the Cell Number about a debt related to "a separate account and separate client" who happened to use "plaintiff's cell number." (ECF No. 38 at PageID 632.) Thus, Golden Title asserts that it acted in good faith when placing the 385 calls because it intended to contact Robinson using information it claims she provided and had no duty to determine whether that information was linked to another customer. (Id.) Although Golden Title correctly states that it obtained consent separately from Higgs and Robinson, this fact alone is not enough to fit its argument within the Michel's reasoning.

First, this case is very different than Michel. Here, Golden Title is the lone creditor. At one point in time, it did have consent to contact both Higgs and Robinson using the Cell Number. The Parties agree that consent was revoked to call the Cell Number as it related to Higgs' prior loan, but they disagree as to whether revocation was effective as to Robinson being contacted using that same number. The issue here is not whether Higgs' revocation on her own loan should have also applied to Robinson. Rather, the issue is whether, for different reasons, Robinson's consent had been revoked. This is not the same as Michel.

Second, Golden Title's attempted reliance on the "home" phone number in the Title Agreement is not factually supported by Golden Title's own automated phone records. Higgs put Golden Title on notice as early as March 14, 2019 that Robinson was no longer employed

12

and did so several times thereafter. Golden Title made a note of Robinson's unemployment in its system on March 14, 2019, following its conversation with Higgs. (ECF No. 33-4 at PageID 454) (ECF No. 32-5 at PageID 236.) Golden Title also noted that Robinson informed it on April 16, 2019 that she was unemployed. Despite this, Golden Title placed its first automated call to the Cell Number on May 18, 2019, intending to reach Robinson on her "work" phone number, months after it first learned that Robinson was unemployed.

Finally, Golden Title's assertion that it did not have a duty to cross-reference its system to determine whether its consumers shared the same phone number is correct but irrelevant because it <u>did</u> have a duty to stop directing calls to Robinson's "work" phone number once it learned that she was unemployed. Golden Title's own autodialed call log shows that it directed all calls to Robinson's work number in connection with the debt she owed. Golden Title could have directed these calls to Robinson's "home" phone number or her cell phone number ending in "8501," as it had done before. Neither of these options required Golden Title to conduct a cross-reference investigation. Golden Title chose not to take these reasonable measures and continued to harass Higgs until she filed this action. Given Golden Title's actual knowledge that Robinson was no longer employed yet it called her "work" number 385 times, the Court does not find that Golden Title acted in "good faith."

Other courts have awarded treble damages to plaintiffs in similar cases but who received remarkably fewer than 385 calls. In <u>Harris v. World Financial Network Nat. Bank</u>, 867 F. Supp. 2d 888 (E.D. Mich. 2012), the court awarded treble damages to a plaintiff who had received 56 automated calls from a creditor in violation of the TCPA. <u>Id.</u> at 897. There, someone represented plaintiff's cell phone number as their own on three separate credit accounts. When that individual fell behind on payments, defendant called the cell number provided. After the

plaintiff notified the defendant that it had the "wrong number" and instructed it to stop calling, the defendant removed the plaintiff's number from the individual's first account but continued to place automated calls in relation to the second and third accounts. Id. at 891. The court awarded the plaintiff treble damages, finding that the defendant had willfully violated the TCPA by continuing to call the plaintiff after it learned his phone number did not belong to the indebted individual. Id. at 896. The court reasoned that defendant "[was] in a better position to review [its] system to ensure that [plaintiff's] number was not tied to any of [the individual's] accounts" because (1) its system had the technical capability to "purge" plaintiff's phone number from all associated accounts and (2) its policy was to remove wrong numbers from accounts once it was notified of that fact. Id.

Similarly, Golden Title continued to place calls to Higgs' Cell Number despite knowing the number was no longer a valid means to contact Robinson. Although the Court leaves aside the issue of whether Golden Title should have verified all accounts linked to the Cell Number, there is no question that Golden Title should have stopped calling Robinson's work number once it learned she was unemployed. Because Golden Title failed to take this easy step and instead chose to harass Higgs by placing 385 calls to her cell phone over the span of over a year, the Court finds that treble damages is not only reasonable, but also appropriate in this case. There are no issues of fact on this issue, and Higgs is entitled to this relief as a matter of law. Thus, the Court **GRANTS** Higgs's Partial Motion for Summary Judgment as to treble damages.

### III.   Invasion of Privacy Claim

Golden Title also seeks summary judgment on Higgs' invasion of privacy claim, which alleges that Golden Title intruded on her "solitude, seclusion or private affairs or concerns" by placing the 385 calls to her cell phone. (ECF No. 1 at PageID 8.) The Tennessee Supreme Court

expressly recognized a cause of action for unreasonable intrusion upon another person's seclusion. Givens v. Mullikin, 75 S.W.3d 383, 411 (Tenn. 2002). In so recognizing, the Court found that a plaintiff may prevail on an intrusion by seclusion claim by showing that the defendant (1) intentionally intruded, physically or otherwise, upon (2) the plaintiff's solitude or seclusion or private affairs, and (3) the intrusion would be highly offensive to a reasonable person." Id.; see Roberts v. Essex Microtel Assocs., 46 S.W.3d 205, 211 (Tenn. Ct. App. 2001). Unlike the tort of "publication of private affairs," intrusion upon seclusion claims do not require that the information the defendant gained was ever made public. Cordell v. Detective Publications, Inc., 307 F. Supp. 1212, 1217 (E.D. Tenn. 1968).

"Excessive unwanted telephone calls may give rise to a claim of unreasonable intrusion upon seclusion." Charvat v. NMP, LLC, 656 F.3d 440, 452-54 (6th Cir. 2011) (analyzing Ohio state common law for an invasion of privacy claims); see also Hoffman v. GC Servs. Ltd. P'ship., No. 3:08-cv-255 2010 WL 9113645 (E.D. Tenn. Mar. 3, 2010) (finding that the plaintiff's invasion of privacy claim against defendant for receiving 75 unwanted, automated phone calls was actionable); Pittman v. J.J. Mac. Intyre Co., Inc., 969 F. Supp. 609, 613-14 (D. Nev. 1997) (recognizing plaintiffs may have an intrusion upon seclusion claim when they show that defendant debt collectors made repeated calls to their workplace.)

Here, Golden Title argues that Higgs cannot sustain her privacy claim because she failed to offer proof of the claim's essential elements. (ECF No. 31-2 at PageID 181.) In support, Golden Title relies on a standard found in Givens that differs from the one stated above. According to Golden Title, Higgs can only state intrusion upon seclusion claim by showing that:

> (1) the information sought by the opposing party was not properly discoverable or was otherwise subject to some form of privilege; (2) that the opposing party knew that the information was not discoverable or was subject to privilege, but nevertheless proceeded to obtain that information; (3) that the obtaining of such

15

>information would be highly offensive to a reasonable person; and (4) that injury was suffered from the invasion of privacy.

Givens, 75 S.W.3d at 411. According to Golden Title, by applying this standard, Higgs' privacy claim necessarily fails because her Cell Number was "properly discover[ed]" when she voluntarily provided it to Golden Title on her loan application. The Court finds Golden Title's position unconvincing.

Givens specifically dealt with defendant's alleged invasion of privacy during the discovery process and involved plaintiff's health information. Id. at 392. There, plaintiff alleged that the defendant's insurance company's counsel invaded her privacy by obtaining her medical information using defective subpoenas and having informal conversations with her physician without her consent. Id. at 411. Before the Givens court analyzed this issue, it adopted the Roberts holding, which articulated the necessary elements of an intrusion upon seclusion claim: "one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another of his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Givens, 75 S.W.3d at 411 (quoting Roberts 46 S.W.3d at 211). The Givens court then listed additional elements that specifically pertained to the discovery process because the facts of that case involved privileged health information that was allegedly obtained from opposing counsel by improper means. Id. at 411-12. Thus, the Court does not find that including the "properly discoverable" standard is appropriate for this case.

Returning to the proper standard for intrusion of seclusion claims and construing all facts in the light most favorable to Higgs, the Court finds that a genuine issue of material fact remains concerning whether Golden Title intruded on Higgs' seclusion in a highly offensive manner by placing 385 unwanted calls to her cellphone. Thus, Golden Title's Motion for Summary Judgment as to Higgs' invasion of privacy claim is **DENIED**.

## **CONCLUSION**

For the reasons stated above, Golden Title's Motion for Summary Judgment is **DENIED**, and Higgs' Motion for Partial Summary Judgment is **GRANTED**.

**IT IS SO ORDERED,** this 27th day of October, 2021.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE
